**UNITED STATES DISTRICT COURT FOR**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JUL-BUR ASSOCIATES INC. and JULIE'S BOTTEGA**<br>**Plaintiffs,**<br><br>**vs.**<br><br>**SELECTIVE INSURANCE COMPANY OF AMERICA and SELECTIVE INSURANCE COMPANY OF THE SOUTHEAST**<br><br>**Defendants.** | **FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**No.: 2:20-cv-01977-TJS** |

Plaintiffs, Jul-Bur Associates, Inc., and Julie's Bottega, bring this Amended Complaint, alleging against Defendants, Selective Insurance Company of America and Selective Insurance Company of the Southeast, as follows:

## I. NATURE OF THE CASE

1. This is a civil action seeking declaratory relief arising from Plaintiffs' contract of insurance with the Defendants.

2. In light of the Coronavirus global pandemic and state orders mandating all non-life- sustaining businesses in the Commonwealth to cease operations and stay at home, Plaintiffs shut their doors on March 16, 2020.

3. Plaintiffs' insurance policy provides coverage for all non-excluded business losses, and thus provides coverage here.

4. As a result, Plaintiffs are entitled to declaratory relief that their business is covered for all business losses that have been incurred in an amount greater than $150,000.00.

## II. JURISDICTION

5. This court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332, because there is complete diversity of citizenship between Plaintiffs and the Defendants. Plaintiffs are a Pennsylvania Corporation. Defendant Selective Insurance Company of America is a New Jersey Corporation with its principal place of business in New Jersey. Defendant Selective Insurance Company of the Southeast is an Indiana Corporation with its principal place of business in Indiana. Further, Plaintiffs have suffered business losses in an amount greater than $150,000.00. The amount in controversy necessary for diversity jurisdiction over a declaratory judgment action is measured by the value those business losses. *Id.* at § 1332(a).

6. The Court has personal jurisdiction over the Defendants because at all relevant times they have engaged in substantial business activities in the Commonwealth of Pennsylvania. At all relevant times Defendants transacted, solicited, and conducted business in Pennsylvania through its employees, agents, and/or sales representatives, and derived substantial revenue from such business in Pennsylvania.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial portion of the wrongful acts upon which this lawsuit is based occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because the Defendants are corporations that have substantial, systematic, and continuous contacts in the Commonwealth of Pennsylvania, and as a result are subject to personal jurisdiction in this District.

8. The acts and/or omissions complained of took place, in whole or in part, within the venue of this Court.

## III. PARTIES

9. At all relevant times, Plaintiffs Jul-Bur Associates, Inc and Julie's Bottega (Julie's Bottega") were authorized to do business and was doing business in the Commonwealth of Pennsylvania, County of Montgomery, Lower Merion Township, in Bala Cynwyd, PA, 19004.

Julie's Bottega owns, operates, manages, and/or controls a retail clothing store by the same name located at 156 Montgomery Avenue, Bala Cynwyd, PA 19004-2969.

10. At all relevant times, Defendants Selective Insurance Company of America and Selective Insurance Company of the Southeast (collectively hereinafter referred to as "Selective") are corporations doing business in the Commonwealth of Pennsylvania, subscribing to Policy Number S 2273553 issued to the Plaintiffs for the period of March 15, 2020 to March 15, 2021. *See* Policy Declaration page, attached hereto as Exhibit 1. Defendants Selective transact business of insurance in the Commonwealth of Pennsylvania and within the County of Montgomery and the basis of this suit arises out of such conduct.

## IV. FACTUAL BACKGROUND

### A. Insurance Coverage

11. On or about March 15, 2020, Selective entered into a contract of insurance with the Plaintiffs, whereby Plaintiffs agreed to make payments to Selective in exchange for the Defendants' promise to indemnify the Plaintiffs for losses including, but not limited to, business income losses at Plaintiffs' place of business located in Bala Cynwyd, PA at the address noted above in this Amended Complaint (the "Insured Property").

12. The Insured Property consists of offices and a retail store located at 156 Montgomery Avenue, Bala Cynwyd, PA 19004-2969 which is owned, leased by, managed, and/or controlled by the Plaintiffs.

13. The Insured Property is covered under a policy issued by Selective with Policy Number S 2273553 (hereinafter "Policy").

14. The Policy is currently in full effect, providing, among other things property, business personal property, business income and extra expense, contamination coverage, and

additional coverages between the period of March 15, 2020 through March 15, 2021.

15. Plaintiffs faithfully paid policy premiums to Defendants, specifically to provide, among other things, additional coverages in the event of business interruption or closures by order of Civil Authority.

16. Under the Policy, insurance is extended to apply to the actual loss of business income sustained and the actual, necessary and reasonable extra expenses incurred when access to the Insured Property is specifically prohibited by order of civil authority as the direct result of a covered cause of loss to property in the immediate area of Plaintiffs' Insured Property. This additional coverage is identified as coverage under "Civil Authority."

17. The Policy is an all-risk policy, insofar as it provides that covered causes of loss under the policy means direct physical loss or direct physical damage unless the loss is specifically excluded or limited in the Policy.

18. An all-risk policy is one that protects against catastrophic events, such as the Coronavirus (also known as COVID-19). COVID-19, a pandemic currently being experienced on a global scale, has resulted in the widespread, omnipresent and persistent presence of COVID-19 in and around Plaintiffs' Insured Property and adjacent properties.

19. Plaintiffs' all-risk policy includes coverage for business interruption, which is standard in most all-risk commercial property insurance policies, along with coverage for extended expenses.

20. Plaintiffs purchased the aforementioned Policy expecting to be insured against losses, including, but not limited to, business income losses at its clothing store.

21. Plaintiffs purchased, among other coverages, business interruption coverage for closure by Order of Civil Authority.

22. Based upon information and belief, the Policy provided by Defendants included language that is essentially standardized language adopted from and/or developed by the ISO ("Insurance Service Office"). The ISO, founded in 1971, provides a broad range of services to the property and casualty insurance industry. In addition to form policies, ISO collects and manages databases containing large amounts of statistical, actuarial, underwriting, and claims information, fraud-identification tools, and other technical services. ISO describes itself as follows: "ISO provides advisory services and information to many insurance companies. … ISO develops and publishes policy language that many insurance companies use as the basis for their products." ISO General Questions, Verisk, https://www.verisk.com/insurance/about/faq/ (last visited June 11, 2020); see also Insurance Services Office (ISO), Verisk, https://www.verisk.com/insurance/brands/iso/ (last visited June 11, 2020).

23. The language in the Policy is language that is "adhesionary" in that Plaintiffs were not participants in negotiating or drafting its content and provisions.

24. Plaintiffs possessed no leverage or bargaining power to alter or negotiate the terms of the Policy, and more particularly, Plaintiffs had no ability to alter, change or modify standardized language derived from the ISO format.

25. Plaintiffs purchased the Policy with an expectation that they were purchasing a policy that would provide coverage in the event of business interruption and extended expenses, such as that suffered by Plaintiffs as a result of Covid-19.

26. At no time had Defendants, or their agents, notified Plaintiffs that the coverage that Plaintiffs had purchased pursuant to an all-risk policy that included business interruption coverage, had exclusions and provisions that purportedly undermined the very purpose of the coverage, of providing benefits in the occurrence of business interruption and incurring

extended expenses.

27. The purported exclusions of the Policy that Defendants have or are expected to raise in defense of Plaintiffs' claim under the Civil Authority coverage of the Policy are strained and contradictory to the provision of Civil Authority Order coverage.

28. Furthermore, Defendants' expected application of exclusions to undermine Plaintiff's bargained-for coverage violates public policy of the Commonwealth of Pennsylvania as a contract of adhesion and hence not enforceable against Plaintiffs.

29. Access to Plaintiffs' business was prohibited by Civil Authority Orders and the Policy provides for coverage for actual loss of business sustained and actual expenses incurred as a covered loss caused by the prohibitions of the Civil Authority Orders in the area of Plaintiffs' Insured Property.

30. The reasonable expectations of Plaintiffs were that the business interruption coverage included coverage when a civil authority forced closure of the business for an issue of public safety in the immediate area surrounding the Insured Property.

31. The Policy does not exclude the losses suffered by Plaintiffs and therefore the Policy does provide coverage for those losses.

32. Plaintiffs suffered direct physical loss or damage within the definitions of the Policy as loss of use of property, as in this case, constitutes loss or damage.

33. The virus and bacterium exclusions do not apply because Plaintiffs' losses were not directly caused by a virus, bacterium or other microorganism. Instead, Plaintiffs' losses were caused by the entry of Civil Authority Orders, particularly those by Governor Wolf and by the Pennsylvania Department of Health, to mitigate the spread of COVID-19.

34. Further, the Virus Exclusion was first permitted by state insurance departments

due to misleading and fraudulent statements by the ISO that property insurance policies do not and were not intended to cover losses caused by viruses, and so the Virus Exclusion offers mere clarification of existing law. To the contrary, before the ISO made such baseless assertions, courts considered contamination by a virus to be physical damage. Defendant's use of the Virus Exclusion to deny coverage here shows that the Virus Exclusion was fraudulently adopted, adhesionary, and unconscionable. *See* https://www.propertycasualty360.com/2020/04/07/here-we-go-again-virus-exclusion-for-covid-19-and-insurers/ (last visited June 12, 2020).

35. Based on information and belief, the Defendants have accepted the policy premiums with no intention of providing any coverage for business losses or the Civil Authority extension due to a loss and shutdown from a virus pandemic.

**B. <u>The Coronavirus Pandemic</u>**

36. The scientific community, and those personally affected by the virus, recognize the Coronavirus (also known as Covid-19) as a cause of real physical loss and damage. It is clear that contamination of the Insured Property would be a direct physical loss requiring remediation to clean the surfaces of the offices and retail store constituting the Insured Property.

37. The virus that causes COVID-19 remains stable and transmittable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard and up to two to three days on plastic and stainless steel. See https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited April 9, 2020).

38. The CDC has issued a guidance that gatherings of more than 10 people must not occur. People in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19.

39. On March 11, 2020 the World Health Organization ("WHO") made the

assessment that COVID-19 shall be characterized as a pandemic. *See* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited June 11, 2020).

40. The global Coronavirus pandemic is exacerbated by the fact that the deadly virus physically infects and stays on surfaces of objects or materials, "fomites," for up to twenty-eight (28) days.

41. A particular challenge with the novel coronavirus is that it is possible for a person to be infected with COVID-19 but be asymptomatic. Thus, seemingly healthy people unknowingly spread the virus via speaking, breathing, and touching objects.

42. While infected droplets and particles carrying COVID-19 may not be visible to the naked eye, they are physical objects which travel to other objects and cause harm. Habitable surfaces on which COVID-19 has been shown to survive include, but are not limited to, stainless steel, plastic, wood, paper, glass, ceramic, cardboard, and cloth.

43. China, Italy, France, and Spain have implemented the cleaning and fumigating of public areas prior to allowing them to re-open publicly due to the intrusion of microbials.

44. Courts in France have ruled that business interruption coverage applies where businesses lost revenue as a result of being forced to close their doors due to orders of civil authority in response to the COVID-19 Pandemic. *See* https://www.insurancejournal.com/news/international/2020/05/22/569710.htm (Last Visited June 11, 2020).

45. The determinations by courts in France, and potentially other countries, that coverage exists is consistent with public policy that in the presence of a worldwide Pandemic such as COVID-19, businesses that possess business interruption insurance coverage should

recover their losses from the insurance carriers.

**C. Civil Authority**

46. On March 6, 2020, Pennsylvania Governor Tom Wolf issued a Proclamation of Disaster Emergency, the first formal recognition of an emergency situation in the Commonwealth as a result of COVID-19. *See* Exhibit 2.

47. On March 19, 2020 Governor Wolf issued an Order requiring all non-life-sustaining businesses in Commonwealth to cease operations and close all physical locations. Businesses that were permitted to remain open were required to follow "social distancing practices and other mitigation measures defined by the Centers for Disease Control." *See* https://www.scribd.com/document/452416027/20200319-TWW-COVID-19-Business-Closure-Order (last visited April 7, 2020).

48. On March 23, 2020, Governor Wolf issued a Stay-at-Home Order for residents of Philadelphia, Allegheny, Bucks, Chester, Delaware, Monroe, and Montgomery Counties. *See* Exhibit 3. On that same date, the Pennsylvania Department of Health issued a similar Order, noting that "operation of non-life-sustaining businesses present the opportunity for unnecessary gatherings, personal contact and interaction that will increase the risk of transmission and the risk of community spread of COVID–19." *See* Exhibit 4.

49. On April 1, 2020, Governor Wolf extended the March 23, 2020 Stay at Home Order to the entire Commonwealth of Pennsylvania. *See* Exhibit 5.

50. The Pennsylvania Supreme Court recently clarified the Governor's Orders and supported Plaintiff's position that physical loss and damage exists resulting in coverage here. *See Friends of DeVito, et. al v. Wolf*, No. 68 MM 2020 (Pa. April 13, 2020).

51. Further, on April 10, 2020 President Trump seemed to support insurance

coverage for business loss like that suffered by the Plaintiff:

> REPORTER: Mr. President may I ask you about credit and debt as well. Many American individuals, families, have had to tap their credit cards during this period of time. And businesses have had to draw down their credit lines. Are you concerned Mr. President that that may hobble the U.S. economy, all of that debt number one? And number two, would you suggest to credit card companies to reduce their fees during this time?
>
> PRESIDENT TRUMP: Well it's something that we've already suggested, we're talking to them. ***Business interruption insurance***, I'd like to see these insurance companies—you know you have people that have paid. When I was in private I had business interruption. When my business was interrupted through a hurricane or whatever it may be, I'd have business where I had it, I didn't always have it, sometimes I had it, sometimes, I had a lot of different companies. ***But if I had it I'd expect to be paid***. You have people. I speak mostly to the restaurateurs, where they have a restaurant, they've been paying for 25, 30, 35 years, business interruption. They've never needed it. All of a sudden they need it. And I'm very good at reading language. I did very well in these subjects, OK. And I don't see the word pandemic mentioned. Now in some cases it is, it's an exclusion. But in a lot of cases I don't see it. I don't see it referenced. And they don't want to pay up. I would like to see the insurance companies pay if they need to pay, if it's fair. And they know what's fair, and I know what's fair, I can tell you very quickly. But business interruption insurance, that's getting a lot money to a lot of people. And they've been paying for years, sometimes they just started paying, but you have people that have never asked for business interruption insurance, and they've been paying a lot of money for a lot of years for the privilege of having it, and then when they finally need it, the insurance company says 'we're not going to give it.' We can't let that happen.

https://youtu.be/_cMeG5C9TjU (last visited on April 17, 2020) (emphasis added).

52. The President is articulating a few core points:

a. Business interruption is a common type of insurance, especially for restaurants (and by extension, other forms of retail establishments).

b. Businesses pay in premiums for this coverage and should reasonably expect they'll receive the benefit of the coverage.

c. This pandemic should be covered unless there is a specific exclusion for pandemics.

d. If insurers deny coverage, they would be acting in bad faith.

e. Public policy considerations support a finding that coverage exists and that Defendants' denial of coverage would be in violation of public policy.

53. These Orders and proclamations, as they relate to the closure of all "non-life-sustaining businesses," evidence an awareness on the part of both state and local governments that COVID-19 causes damage to property. This is particularly true in places where business is conducted, such as Plaintiffs', as the requisite contact and interaction causes a heightened risk of the property becoming contaminated.

54. Plaintiffs did not have the ability or right to ignore these Orders made by agents of civil authority, including the Governor of Pennsylvania, as doing so would expose Plaintiffs to fines and sanctions.

55. However, Plaintiffs' adherence to the requirements of these Orders and proclamations was in furtherance of the Orders' intent to protect the public and supportive of public policy to attempt to minimize the risk of spread of COVID-19.

**D. <u>Impact on Julie's Bottega</u>**

56. As a result of the Orders referenced herein, Plaintiffs ceased retail operations on March 16, 2020 and continues to be shutdown.

57. As a further direct and proximate result of the Orders, Plaintiffs have been forced to lay off a part-time employee.

58. Plaintiffs' business, prior to the Orders, had normal business hours of Monday through Saturday, from 10 am to 5 pm, each day.

59. The months of March and April are typically the business months of the year for Plaintiffs 'business, and during those months, Plaintiffs typically held "trunk shows" involving the showing of a variety of the kinds of goods and materials that Plaintiffs sold, i.e., clothing, accessories, etc., which typically attracted a high volume of customers entering the Insured Property to view the goods and materials being displayed in the trunk shows. The trunk shows typically caused high foot traffic into the Insured Property of Plaintiffs.

60. Plaintiffs' business is not a closed environment, and because people – staff, customers, community members, and others – cycle in and out of the retail store, there is an ever-present risk that the Insured Property is contaminated and would continue to be contaminated. Such risk of contamination would have been heightened during March and April because of the aforesaid trunk shows causing high foot traffic inside of the Insured Property.

61. The Insured Property is more susceptible to being or becoming contaminated, as both respiratory droplets and fomites are more likely to be retained on the Insured Property and remain viable for far longer as compared to other facilities with open-air ventilation.

62. Plaintiffs' business is also highly susceptible to rapid person-to-property transmission of the virus, and vice-versa, because the activities of the staff require them to work in close proximity to one another and because staff routinely assist customers in selecting clothing, provide tailoring services, and assist in customers in trying on clothing for fit.

63. As a retail boutique of women's clothing, Plaintiffs' business, prior to the Pandemic, frequently served customers who would visit the store and use the fitting rooms to try on clothing.

64. Trying on clothing necessarily involves customers touching many objects in Plaintiffs' store and potentially person-to-person interaction.

65. Because of COVID-19's persistence in locations and surfaces, and the prospect of causing asymptomatic responses in some people, the risk of infection to persons is not only high, but could also cause persons with asymptomatic responses to come into contact with others who may develop serious illness.

66. The Civil Authority Orders entered by the state and local government were the lawful exercise of authority to protect the public and minimize the risk of spread of disease.

67. Even with the entry of these Civil Authority Orders, there remained physical impact not only within Plaintiffs' Insured Property but in and around the surrounding location of the Insured Property due to the difficulty of identifying the presence of COVID-19.

68. Upon information and belief, individuals have contracted the COVID-19 illness in Montgomery County and/or in and around the location of the Insured Property, thereby confirming the presence of COVID-19 and its impact on property and locations in and around Plaintiffs' Covered Property, supporting the propriety of the entry of the Civil Authority Orders.

69. The virus is therefore physically impacting Julie's Bottega and the Insured Property. Any effort by the Defendants to deny the reality that the virus causes physical loss and damage would constitute a false and potentially fraudulent misrepresentation that could endanger the Plaintiffs and the public.

70. A declaratory judgment determining that the coverage provided under the Policy is necessary to prevent the Plaintiffs from being left without the vital coverage acquired to ensure survival of Plaintiffs' business due to the shutdown caused by the Civil Authority Orders. As a result of these Orders, Plaintiffs have incurred, and continue to incur, among other things, a substantial loss of business income and additional expenses covered under the Policy.

## V. CAUSE OF ACTION
## DECLARATORY RELIEF

71. Plaintiffs re-allege and incorporate by reference into this cause of action each and every allegation set forth in each and every paragraph of this Amended Complaint.

72. The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *see also Principal Life Ins. Co. v. Minder*, No. CIV A 08-5899, 2009 WL 1917096 (E.D. Pa. July 1, 2009); *Miller v. Liberty Mut. Grp.*, 97 F. Supp. 2d 672 (W.D. Pa. 2000).

73. An actual controversy has arisen between Plaintiffs and the Defendants as to the rights, duties, responsibilities and obligations of the parties under the Policy in that Plaintiffs contend and, on information and belief, the Defendants disputes and denies that:

a. The Orders constitute a prohibition of access to Plaintiffs' Insured Property;

b. The prohibition of access by the Orders has specifically prohibited access as defined in the Policy;

c. The Policy's Exclusion of Loss Due to Virus or Bacteria does not apply to the business losses incurred by Plaintiffs here.

d. The Orders trigger coverage;

e. The Policy provides coverage to Plaintiffs for any current and future civil authority closures of retail establishments in Montgomery County due to physical loss or damage directly or indirectly from the Coronavirus under the Civil Authority coverage parameters;

f. Under the circumstances of the COVID-19 pandemic and the entry of the Civil Authority Orders, Plaintiffs had no choice but to comply with the Orders, and Plaintiff's compliance resulted in business losses, business interruption and extended expenses, and therefore constitute covered losses;

g. Defendants' denial of coverage for losses sustained that were caused by the entry of the Civil Authority Orders referenced, and Plaintiffs' required compliance with the Orders, violates public policy;

h. The Policy provides business income coverage in the event that Coronavirus has directly or indirectly caused a loss or damage at the insured premises or immediate area of the Insured Property; and

i. Resolution of the duties, responsibilities and obligation of the parties is necessary as no adequate remedy at law exists and a declaration of the Court is needed to resolve the dispute and controversy.

74. Plaintiffs seeks a Declaratory Judgement to determine whether the Orders constitute a prohibition of access to Plaintiffs' Insured Property as Civil Authority as defined in the Policy.

75. Plaintiffs further seek a Declaratory Judgement to affirm that the Orders trigger coverage.

76. Plaintiffs further seeks a Declaratory Judgment to affirm that the Policy provides coverage to Plaintiffs for any current and future Civil Authority closures of retail businesses such as Plaintiffs' in Montgomery County due to physical loss or damage from the Coronavirus and the policy provides business income coverage in the event that Coronavirus has caused a loss or damage at the Insured Property.

77. Plaintiffs do not seek any determination of whether the Coronavirus is physically in or at the Insured Property, amount of damages, or any other remedy other than declaratory relief.

## VI. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs herein prays as follows:

1) For a declaration that the Orders constitute a prohibition of access to Plaintiffs' Insured Property.

2) For a declaration that the prohibition of access by the Orders is specifically prohibited access as defined in the Policy.

3) For a declaration that the Orders trigger coverage under the Policy.

4) For a declaration that the Policy provides coverage to Plaintiffs for any current and future closures in Montgomery County due to any physical loss or damage directly or indirectly arising out of the Coronavirus and/or pandemic circumstance under the Civil Authority coverage parameters.

5) For a declaration that the Policy's exclusions for virus and bacteria do not apply to the circumstances presented in this lawsuit and the kind and types of damages and losses suffered by Plaintiffs.

6) For a declaration that under the circumstances of the COVID-19 pandemic and the entry of the Civil Authority Orders, Plaintiffs had no choice but to comply with the Orders and Plaintiff's compliance resulted in business losses, business interruption and extended expenses, and therefore constitute covered losses.

7) For a declaration that Defendants' denial of coverage for losses that were caused by entry of the Civil Authority Orders and Plaintiffs' required compliance with those Orders violates public policy.

8) For a declaration that the Policy provides coverage to Plaintiffs for any current, future and continued civil authority closures of non-essential businesses due to physical loss or damage directly or indirectly from the Coronavirus under the Civil Authority coverage parameters.

9) For a declaration that the Policy provides business income coverage in the event that Coronavirus has directly or indirectly caused a loss or damage at the Plaintiffs' Insured

Property or the immediate area of the Plaintiffs' Insured Property.

10) For such other relief as the Court may deem proper.

**TRIAL BY JURY IS DEMANDED**

Plaintiff hereby demands trial by jury.

Dated: June 17, 2020

Respectfully submitted,

*/s/ Richard M. Golomb*

Richard M. Golomb, Esq.
Kenneth J. Grunfeld, Esq.
**GOLOMB & HONIK, P.C.**
1835 Market Street, Suite 2900
Philadelphia, PA 19103
Telephone: (215) 985-9177
Facsimile: (215) 985-4169
rgolomb@golombhonik.com
kgrunfeld@golombhonik.com

Arnold Levin, Esq.
Laurence Berman, Esq.
Frederick Longer, Esq.
Daniel Levin, Esq.
Michael Weinkowitz, Esq.
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3697
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
alevin@lfsblaw.com
flonger@lfsblaw.com
dlevin@lfsblaw.com

W. Daniel "Dee" Miles, III
Rachel N. Boyd
Paul W. Evans
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
P.O. Box 4160
Montgomery, AL 36103
Telephone: (334) 269-2343
Facsimile: (334) 954-7555
dee.miles@beasleyallen.com
rachel.boyd@beasleyallen.com

paul.evans@beasleyallen.com

***Counsel for Plaintiff***